

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

CMM:AXB/CPK
F. #2022R00453

*610 Federal Plaza*
*Central Islip, New York 11722*

September 30, 2025

By ECF

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

    Re: United States v. Cory Zeidman
       Criminal Docket No. 22-228 (JS)

Dear Judge Seybert:

  The government respectfully submits this letter in connection with Cory Zeidman's sentencing in the above-captioned matter. As set forth in the parties' plea agreement, and as described more fully below, the government submits that a principal sentence within the range of 33 to 41 months is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

  I. Background

  Zeidman's prosecution stems from his involvement in an organization that defrauded prospective sports bettors. Between January 2004 and March 2020, Zeidman was a profit-sharing partner in an organization that operated in New York and Florida under the names Phoenix Advisory Services, All Your Consulting Needs, Southeastern Marketing, Top Ticket, Inc., and many others.[1]

  In general, the organization deceived prospective bettors by presenting itself as a prominent fixture in the world of sports betting and telecommunications. In radio advertisements broadcast in markets across the country, the organization described the services it offered as

---

[1] Both of Zeidman's partners, as well as the organization's New York-based office manager, have similarly pled guilty to the instant conspiracy.

representing a more secure investment opportunity than mere gambling.[2] Listeners were directed to call various phone numbers that were manned by the organization's employees. Those callers were eventually routed to Zeidman and his partners, who used fake names and fake personas—which were elaborated in fictitious websites—to build rapport with the bettors and tout the organization's supposed exclusivity and financial success.

Zeidman and his partners then used a variety of methods to extract money from the bettors, including falsely telling bettors that the organization had access to non-public information, such as information about fixed games and predetermined outcomes, undisclosed information about athletes' injuries, information about the intended actions of "dirty" referees, and other data—described as "privileged"—that would make winning risk-free. In actuality, the purportedly "privileged" wagering information supplied by the organization was based on publicly available data and the participants' own internet research. Among other tactics, Zeidman and his partners also falsely told bettors that the organization had been so successful against commercial bookmakers that they had been banned from betting in casinos and needed to share their privileged information with third parties to capitalize on the information.[3] And, after sustaining losses, Zeidman and his partners passed off bettors to another member of the conspiracy, who the bettors were falsely told was higher up in the organization, had better information, and/or was unaffiliated with the organization. In this way, the organization received millions of dollars in cash and wires from individuals who were tricked into believing the organization could provide them with a legitimate betting edge. Proceeds of the scheme were deposited into, and laundered through, multiple bank accounts that Zeidman and other members of the organization controlled. In addition, some proceeds were received at the organization's New York headquarters in the form of bulk cash, which the office manager repackaged and sent along to Zeidman and his partners.[4]

On December 4, 2024, Zeidman appeared before United States Magistrate Judge Lee G. Dunst, waived his right to be indicted by a grand jury, and pled guilty to wire fraud conspiracy, in violation of 18 U.S.C. § 1349.

---

[2] Some of the organization's marketing material, for example, described "an alternative investment method that creates consistent and strong financial gain." That is obviously not an accurate way to characterize sports betting.

[3] In this regard, some of the organization's marketing material stated that, "[l]argely due to their extreme success, their reputation has now limited their abilities to capitalize on this information. By opening up their closed network to the public, they can continue to reap profits while the public will now benefit from very select, very exclusive knowledge." None of that was true.

[4] As recounted in the PSR, this investigation was commenced after federal agents in Indianapolis intercepted a parcel containing $50,000 in cash that was due for the organization's Long Island-based office manager. (*See* PSR ¶ 5).

II. <u>Guidelines Calculation</u>

   A.   <u>Probation's Guidelines Calculation</u>

The Guidelines calculation, as set forth in the PSR, is as follows:

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: Loss Between $9.5 Million and $25 Million (§ 2B1.1(b)(1)(K)) | +20 |
| Plus: Substantial Financial Hardship to 5+ Victims (§ 2B1.1(b)(2)(B)) | +4 |
| Plus: Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus: Organizer/Leader of 5+ Participants (§ 3B1.1(a)) | +4 |
| Less: Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | <u>34</u> |

(PSR ¶¶ 25-36). Based upon a total offense level of 34 and Criminal History Category I, the Probation Department has determined Zeidman's advisory Guidelines range to be 151 to 188 months and has recommended a principal sentence at the low end of that range. (PSR ¶¶ 39, 70; *see generally* Sent'g Rec).

   B.   <u>The Parties' Guidelines Estimate</u>

The government does not object to the Guidelines calculation in the PSR but notes that it differs in material respects from the estimate reflected in Zeidman's plea agreement. For example, although it is undisputed that Zeidman was one of the profit-sharing partners in the organization, the plea agreement perhaps should, but does not, include a role enhancement under U.S.S.G. § 3B1.1. Nor did the parties anticipate an enhancement under U.S.S.G. § 2B1.1(b)(2)(B) pertaining to the substantial financial hardship incurred by multiple victims. In view of the victim impact letters summarized in the PSR and related addenda, a factual basis evidently exists for that enhancement to apply. (*See, e.g.*, PSR ¶¶ 10-14 (summarizing victim impact statements); PSR Addendum dated 4/7/2025 (summarizing additional statements); PSR Addendum dated 9/22/2025 (noting that Probation has received statements from 21 victims and summarizing additional statements)).

On the other hand, the government submits that certain other aspects of its Guidelines estimate—while deemed inaccurate by Probation—nonetheless fairly reflect factual circumstances meriting the Court's consideration. *First*, the parties correctly estimated that Zeidman has no criminal history points and assumed that he would receive a two-point reduction under U.S.S.G. § 4C1.1. If the above-referenced victim enhancement applies, however, Zeidman becomes ineligible for that reduction, which only applies if he "did not personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(6).

*Second*, the parties did not anticipate a two-point enhancement under U.S.S.G.

3

§ 2B1.1(b)(10)(C) for sophisticated means. It is true, as described above, that Zeidman and his partners used aliases, fictitious websites, and various corporate shells and bank accounts to carry out the scheme. (*See* PSR ¶¶ 16, 29). It is also true that, according to the Sentencing Commission, the enhancement can apply when a defendant "hid[es] assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. 2B1.1(b)(10)(C), Application Note 9(B). But while the government does not object to Probation's characterization of the offense conduct here, the fact remains that Zeidman's conduct in developing a fake persona through an alias and corresponding online biography was not particularly sophisticated. Indeed, despite holding himself out to victims as an influential figure in sports gambling, his tactics usually involved pretending that publicly available wagering information was somehow "privileged." Nor, strictly speaking, was the organization's use of corporate shells and bank accounts "especially complex or especially intricate." U.S.S.G. § 2B1.1(b)(10)(C). In most cases, Zeidman and his partners created a new corporate entity and corresponding bank account each time they felt compelled to evade aggrieved bettors. In the end, there is likely ample support in the record for this enhancement to apply; the parties simply did not, but perhaps should have, foreseen it as a component of Zeidman's sentencing exposure.

*Third*, the parties applied an 18-point enhancement for losses between $3.5 million and $9.5 million because that range accurately reflects the fraud proceeds personally received by Zeidman. (*See* PSR ¶ 9). By contrast, the PSR attributes all fraudulent losses—a sum exceeding $20 million—to Zeidman and, accordingly, applies a 20-point enhancement under U.S.S.G. § 2B1.1(b)(1)(K).

III. <u>Discussion</u>

A. <u>Section 3553(a) Analysis</u>

The seriousness of Zeidman's conduct in perpetrating a yearslong scheme targeting unwitting sports bettors, many of whom were in financial straits and desperate for a legitimate betting edge, cannot be overstated. *See* 18 U.S.C. § 3553(a)(2)(A). Zeidman sat atop a team of employees operating in two states, which had been specifically trained to facilitate the fraud. In that regard, when prospective bettors responded to radio advertisements containing materially false descriptions of the organization and the services it offered, the organization's employees "set up" those callers with Zeidman and his partners. Indeed, records seized from Zeidman's Florida offices not only contained directories identifying Zeidman and his co-conspirators by their aliases, but also specifically referred to the process of "setting up" unsuspecting victims.

Drawing on his background as a professional poker player (PSR ¶ 54)—which carried an acute informational and experiential advantage over his victims—Zeidman concocted alter egos, who claimed to be influential figures in the sports gambling industry. The "set up" was aptly named, as employees manning the organization's phones were directed to indulge Zeidman's fiction and condition prospective bettors to believe that Zeidman and his partners were, in fact, part of a highly exclusive organization. Government agents obtained a script that one such "salesman" was provided for use when "setting up" victims for "Paul Knox," one of Zeidman's aliases. And, as was typical of the fraudulent scheme, the "salesman" utilizing that script was encouraged to engage in coercive sales tactics by, *inter alia*, suggesting the victim happened to live in a particular geographic area that was of interest to the organization and making the victim

4

feel as though "Mr. Knox" was an extremely sought-after businessman, who only worked with highly vetted people. Needless to say, these pitches were wholly fictitious.

Victims were nevertheless given detailed instructions on how to act when dealing with Zeidman and his partners. And the false perception that they would be speaking with serious people, with exclusive "investment" opportunities, who they should be eager to please, lowered victims' inhibitions to invest large sums of money when Zeidman and co-conspirators inevitably asked for them. Excerpted below is a script used by a "salesman" in the organization to prepare putative victims for their interactions with Zeidman:

> Uninterrupted Environment, Fully charged cell phone with good reception & NO DRIVING.
> If you have access to a land line it would be preferable. Stationary because you will want a pen & paper to take notes.
> Do not be intimidated & ask all relevant questions
> Be prepared to speak at length.  Go to the bathroom prior
> Mr.Knox is down to earth, street smart & savvy, & Professional
> He is looking to do business with people on that level.
> Address him as Mr Knox ( 56 years old )

Throughout this process, materially false representations were made to victims about the nature and quality of the information to which the organization had access. For example, bettors were told:

> [T]here are a certain number of personally selected games that come from Paul Knox himself that are highly classified, privileged information selections for my own personal benefit. Last year, with just 9 phone calls that came from Mr. Knox's executive secretary, I earned more than twice my annual salary.

In addition, bettors were told:

> You need to understand and respect the fact that because of the nature and sensitive information that Mr. Knox personally has access to . . . It becomes absolutely critical that anything he would share with you on a one-to-one basis, by necessity needs to remain strictly confidential.

This was, of course, all a lie. As noted above, the purportedly "privileged" wagering information supplied by the organization was based on publicly available data and the participants' own internet research. Yet the implication—if not the explicit message—was that Zeidman and his co-conspirators had knowledge the public did not. And for that information, bettors paid Zeidman and his co-conspirators millions of dollars.

When victims lost, which they often did, they were passed off to other members of the conspiracy, whom the victims were falsely told were higher up in the organization, had better information, and/or were unaffiliated with the organization. Despite never revealing to these bettors that Zeidman and his partners were working in close coordination with one another, records

seized from the organization's offices plainly reflect the involvement of multiple co-conspirators and concomitant "split" of profits among them for keeping bettors betting.

Moreover, although the Guidelines do not assign to Zeidman any criminal history points, the instant offense was committed within four years after a 2000 federal conviction for interstate transmission of wagering information in the Middle District of Florida. (*See* PSR ¶ 38). *See United States v. Zeidman*, 99-CR-264 (M.D. Fla. 1999). As outlined in the PSR, that prior offense involved conduct not unlike the offense conduct here:

> The scheme involved that the company operated a telephone network contacting customers throughout the United States and Canada, supplying them with wagering information for a fee and then referring to their controlled offshore bookmakers in Costa Rica. The average wager was $1,000. The companies used several accounts at a local bank to execute the scheme, in differing names, and employees would deposit thousands of dollars from Western Union Money orders. The defendant was a manager of the company, making the 'picks,' distributed to the customers for a fee, and often the customers were provided with losing picks so the company and its bookmaker would profit. The defendant instructed other employees as to procedures used to sell wagering information and then referred customers to these offshore bookmakers.

(PSR ¶ 38).

Given the similarity of the conduct, Probation has identified this prior conviction, and the resulting one-year probationary sentence, as a factor justifying its 151-month sentence recommendation. (*See* Sent'g Rec. 2 (noting "the defendant previously committed a similar offense, and he was given a lenient sentence. However, the lenient sentence did not deter him from engaging in the instant offense which spanned nearly two decades.")). The government agrees that Zeidman's apparent proclivity toward defrauding bettors through wagering schemes speaks both to his history and characteristics and to the need for the Court's sentence to achieve deterrence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(B). Indeed, the PSR indicates that Zeidman does not fit the profile of many of the criminal defendants who come before the Court for sentencing. Rather, he was raised in an intact household, devoid of abuse. (PSR ¶ 47). He maintains an amicable relationship with his ex-wife and has two adult daughters, one of whom is an attorney, who love and support him. (*E.g.*, PSR ¶¶ 48, 49). He has had a successful professional poker career, earning a coveted "bracelet" at the 2012 World Series of Poker. In other words, the instant offense cannot logically be traced to poverty, desperation, or hardship; it appears to have been committed solely for self-enrichment.

B. ███████████████████████████



C. **Financial Penalties**

Restitution is mandatory in this case (PSR ¶¶ 79, 80) and, as part of his guilty plea, Zeidman agreed to pay restitution in the full amount of each victim's losses as determined by the Court. As set forth in its September 22, 2025 addendum to the PSR, Probation has now identified 21 victims seeking restitution in the total amount of $5,242,555.00. (*See* PSR Addendum dated 9/22/2025). No objection to that restitution figure having been asserted, the government submits the Court should adopt it.

In addition, as part of his plea agreement, Zeidman agreed to forfeit $3,694,652.75 in fraud proceeds. (PSR ¶ 81). To that end, on September 9, 2025, the government filed a proposed Order of Forfeiture. (*See* ECF No. 47). The government likewise requests that the Court endorse that order and make it a part of the final judgment in this case.

IV. **Conclusion**

Based on the foregoing, despite its incongruence with Probation's calculation, the government adheres to the non-binding estimate contained in the parties' plea agreement and

---

5 ███████████████████████████████████████████████

submits that a principal sentence within the range of 33 to 41 months is sufficient, but not greater than necessary, here.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:       /s/      
Charles P. Kelly
Anthony Bagnuola
Assistant U.S. Attorneys

cc: Clerk of the Court (JS) (via ECF and e-mail)
    Sarita Kedia, Esq. (via ECF and e-mail)
    Steven Guttman, U.S. Probation Officer (via ECF and e-Mail)